No. 28,102.

O. S. WADDLE et al., *Appellants,* v. A. J. BIRD et al., *Appellees.*

(267 Pac. 974.)

Opinion filed June 9, 1928.

*Robert Garvin,* of Stafford, *J. N. Tincher, Frank L. Martin* and *James N. Farley,* all of Hutchinson, for the appellants.

*F. Dumont Smith, Eustace Smith, Arthur T. Symns,* all of Hutchinson, and *R. F. Crick,* of Pratt, for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action by five persons who were formerly the directors of the Hopewell Coöperative Equity Exchange against a number of individuals who had been stockholders in the

exchange, for contribution and for subrogation to all the rights of the Farmers State Bank of Hopewell, based upon an indemnity contract given by the defendants at the request of the bank. The defendants answered by general denial and by pleading the three- and the five-year statutes of limitations, the solvency of the exchange when the liability accrued, no loss under the contract, and that if loss was sustained it occurred later by reason of mismanagement of the plaintiffs as directors and under circumstances for which the defendants were not liable. The case was tried to the court without a jury, findings of fact and conclusions of law were made by the trial court, and judgment was rendered in favor of defendants, from which plaintiffs appeal.

At an annual meeting of the stockholders of the exchange on June 8, 1918, the by-laws were amended to authorize the president, vice president, secretary, treasurer, or manager to borrow money to conduct the business of the exchange and to sign notes either for new loans or renewals. At the same meeting the following resolution was unanimously adopted:

"On motion, it was decided for each member to sign up $500 security to bank for money to transact the equity business."

Under such amended by-laws and resolution the directors borrowed large sums from the Farmers State Bank of Hopewell, the notes being signed by the manager, and the directors personally obligated themselves, not by indorsement but otherwise, for the prompt payment of all the indebtedness of the exchange to the bank. Subsequently, this obligation was put in the form of what was called a continuing contract. Later, at the request of the bank, the stockholders were asked to sign a written obligation prepared by it, which they did sign. It is referred to in this litigation as exhibit A, and is as follows:

"EXHIBIT A.

"*Know All Men by These Presents:* That we, the undersigned, being stockholders or other interested parties in The Hopewell Coöperative Exchange, a corporation duly organized and existing under and by virtue of the laws of the state of Kansas, do hereby request the directors of said the Equity Exchange to bond and pledge themselves individually to the Farmers State Bank of Hopewell, Kan., for the purpose of obtaining credit for the said Equity Exchange in the amount of twenty-five thousand dollars.

"*Now,* If the directors of said the Equity Exchange will so bond and pledge themselves individually to said bank, we the undersigned stockholders hereby agree that we will reimburse said directors for any loss arising on account

of said bond or pledge up to and including the sum of *five hundred dollars* each; it being our intention that each signer of this instrument shall stand individually liable for any sum up to and including five hundred dollars for the purpose of making said directors safe in signing said pledge, or bond to said bank.

"In case any loss is sustained by said directors on account of said bond or pledge, we hereby agree promptly to reimburse said directors for said loss; it being distinctly understood, however, that no one stockholder shall be called upon to pay more than five hundred dollars."

After being signed by all the stockholders, including the directors, it was delivered to the directors, and by them in turn delivered to the bank.

The directors, thus bonding and pledging themselves personally, in addition to the corporation notes signed by the manager, borrowed various sums from the Hopewell bank from time to time until May, 1920, when the amount of the loan was $23,500. At that time the bank notified the directors that the loan must be reduced to $6,000 until September, when it could again be increased to as much as $25,000, if desired. The court found, and the evidence plainly shows, that in May, 1920, the exchange was solvent and had assets over liabilities to the amount of $9,149.29. The trial court also found that the exchange had in September, 1920, $16,600 more assets than liabilities. In the month of June, 1920, the directors transferred the account of the exchange from the Hopewell bank to the Macksville State Bank, and borrowed from the latter bank sufficient money to liquidate all the obligations of the exchange held by the Hopewell bank.

At the annual meeting of the stockholders in May, 1924, it was decided to close the business of the exchange, and the directors were ordered to sell the property. This was done, and the court found that, after selling and disposing of all the assets of the exchange and applying the proceeds upon the indebtedness, there remained the sum of $13,875 due the Macksville State Bank, which has been paid by the directors. This action was filed November 29, 1924. Amended petitions were filed May 2, 1925, December 18, 1925, and April 18, 1927.

The original petition sets out a cause of action for reformation of the contract above referred to as exhibit A, and also pleads for contribution. The first amendment really only separately states and numbers the causes of action contained in the original petition. The next amended petition contained the same general allegations,

and concludes by pleading for reformation and subrogation. The last petition was filed after a decision of this court in this case, reported in 122 Kan. 716, 253 Pac. 576, holding adversely to plaintiff's contention on the question of reformation; therefore, specific allegations along that line were eliminated, and the petition concludes with a prayer for contribution and subrogation.

Many errors are assigned by appellants, both as to the findings of fact and the conclusions of law, but we think there is not much ground for difference as to the findings of fact. Of course, all the facts were not included in them, and our attention has not been directed to anything omitted that would be so essential or important as to modify or change the conclusions based thereon.

While the terms "contribution" and "subrogation" each refer to very distinct remedies and relations of parties, yet the facts stated in the petitions must control rather than the terms used, especially in the prayer for recovery and relief. Aside from the question of reformation, with which we now have nothing to do, all the petitions by their allegations assert a claim of right to recover from each of the defendants the sum of $500 under and by virtue of the indemnity contract (exhibit A). Defendant thought there was more than one cause of action in the original petition, and so moved to require that they be separately stated and numbered, and the trial court so ordered. The apparent confusion with the term "contribution" arises from the fact that the plaintiffs do occupy a dual capacity in that they as stockholders signed exhibit A with the defendants, and, if it had not run to them as directors, their claim against the other signers might well have been termed as for contribution.

These preliminary observations are made with the view of harmonizing the allegations and claims of the four petitions after eliminating all references to reformation and to conclude that it seems to have been from the beginning an action to recover upon a contract (exhibit A). The briefs present different views as to the relation of the several parties and their consequent obligations, rights and privileges, especially with reference to principal and surety, and also as to obligations as stockholders. We think the exchange, a corporation doing an active business and needing more money than it had, was the principal when its directors borrowed money for it from the Hopewell bank. The stockholders, as such, were not debtors, even if they did receive dividends from the use of the borrowed money put into the business. Their liability as stockholders is fixed

by statute. They cannot be the principals unless they do something themselves to incur additional liabilities, which they did by signing exhibit A. As stockholders, at the annual meeting, they promised "to sign up $500 security." Suppose that after so voting some of them had refused to sign up. Could they be made liable to the plaintiffs in this action? Or, suppose some good friends of the exchange, who were not stockholders, wanted to help it and had signed exhibit A. Would they be exempt from liability in an action on this contract because they were not stockholders in the exchange? We think the signing up security makes whatever liability there exists here, regardless of their relation to the exchange, and therefore such signers are not principals in these obligations, but at most are sureties, or rather indemnitors.

It is contended that the directors are only sureties; that they received no benefit from the loans and made themselves personally liable to the bank under a continuing contract before the bank would make the loan to the exchange. This certainly makes them only sureties as between them and the exchange.

It is further contended that the signers of exhibit A, being stockholders and present at the several meetings of the exchange, and having heard the reports there made from time to time as to the financial and other business of the corporation, impliedly consented to the steps taken by the directors in changing its account and business from the Hopewell bank to the Macksville bank, and are bound by their silence and acquiescence. The case of *Bank v. Livermore,* 90 Kan. 395, 133 Pac. 734, is distinguishable from this case in that the three signers of the note of the corporation, which was renewed and extended without their consent, were directors and principal stockholders, and therefore "not entitled to the same liberality of treatment that the law accords to volunteer sureties." (Syl. ¶ 3.) The defendants in the case at bar were not directors and, as stockholders, had, by an amended by-law, delegated to the directors and their officers the full authority as to borrowing money. Two cases cited along the same line, *Bank v. Prescott,* 60 Kan. 490, 57 Pac. 121, and *Harrison v. Scott,* 77 Kan. 637, 95 Pac. 1045, turn partly upon the old question of double liability of stockholders, and for that reason are not decisive in this case. In the Livermore case, above cited, it is made very plain in the opinion that the fact that the defendants were directors and principal stockholders, and the

ones most vitally interested in the loan and the use of the money borrowed, does in no way create or constitute an obligation, but that they were not to be relieved from such admitted obligation as readily as if they had been mere volunteer sureties under the technical rule of granting an extension without the consent of the sureties. The same rule might apply as to a strict or liberal construction of the contract here in question.

The conclusions of law made by the trial court are as follows:

"The defendants, the stockholders, obligated themselves only upon the contract, following which credit was secured and liability incurred at the Hopewell State Bank. Their liability could not be further extended without their consent. Any right of contribution would have arisen on the date of payment of the Hopewell State Bank, to wit, the month of June, 1920. On that date the Hopewell Coöperative Equity Exchange had sufficient assets to pay all indebtedness of the exchange. The directors suffered no loss under the contract. Plaintiffs can not recover herein."

To whom and for what are the defendants bound by the terms of the contract signed by them? The first paragraph requests the directors of the exchange to bond and pledge themselves individually to the Hopewell bank for the purpose of obtaining credit for the exchange. The second paragraph contains the obligation that if the *directors* do so pledge themselves to "said bank" the signers agree to reimburse *them* for any *loss* arising on account of said *pledge* up to $500 each, "for the purpose of making *said directors* safe in signing said *pledge or bond* to *said bank*." The third paragraph reiterates the promise to the *directors* to reimburse *them* to the extent of $500 each in case *such loss* is sustained by *them* on account of *"said bond or pledge."* The obligation runs to the directors, the plaintiffs herein. It requests them to pledge themselves to the Hopewell bank to obtain credit for the exchange, and binds the makers in case of a loss on account of making such pledge to reimburse them—the directors—to the extent of $500 for each of the makers.

To construe this contract as covering a bond or pledge made to some other bank than the Hopewell bank, to which reference is made three times in the contract, it is necessary to read into the contract something not now there. There is no rule requiring liberal construction as against indemnitors. "It cannot be extended by construction or implication beyond the terms of the contract." (31 C. J. 427.) It indemnifies the directors, and them only. It does

not pretend to indemnify the bank. It is to reimburse the directors, and therefore there is no need of subrogation. The directors have now and always have had all they could have acquired under the contract by subrogation. It did not run to the bank, and it never had anything therein to assign. It is doubtful if the Hopewell bank could have sued and recovered anything on this contract. At least some circumstance would have to be alleged by the bank that is not now shown in the evidence before the bank could recover directly.

"Subrogation is the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." (37 Cyc. 363.)

The same principle is applied in many of the cases cited. See *Crippen v. Chappel,* 35 Kan. 495, 11 Pac. 453; *Safe Deposit Co. v. Thomas,* 59 Kan. 470, 53 Pac. 472; *Olson v. Peterson,* 88 Kan. 350, 128 Pac. 191; *Breyfogle .v. Jackson,* 113 Kan. 373, 214 Pac. 779.

"Subrogation or equitable assignment is based on principles of natural justice and essential fairness without regard to form—its object being the prevention of injustice." (*Deposit Co. v. City of Stafford,* 93 Kan. 539, syl. ¶ 2, 144 Pac. 852.)

But the most decisive feature of the contract is its limited purpose, viz., to reimburse the directors for any loss arising on account of the pledge and to make the directors safe in signing the pledge or bond to the bank. The findings and the evidence show the directors did not suffer any loss in signing the pledge to the bank. The loss they sustained accrued and arose months and years later on account of signing a similar pledge with another bank.

Appellants reason that, because this contract might have protected the directors against a loss sustained by giving their pledge to the Hopewell bank years later if they had continued to borrow there, it is only equitable and fair that the same protection be orded when the loss occurred elsewhere, and cite the case of *Canning Co. v. Hensley,* 149 Ia. 168, where the syllabus so indicates; but the opinion justifies that conclusion upon two facts—first, that the loan was actually obtained from a local bank, which, however, procured another bank to carry it, and, second, because the language of the contract of indemnity in a separate blanket clause included all indebtedness of every kind and character. The very reason given for the conclusion thus reached in this Iowa case is

most convincing that the loss must have been sustained at a bank which can be included in the language of the contract itself. The cardinal rule for the construction of indemnity contracts is the reasonable construction, neither strict nor liberal. (14 R. C. L. 46.) The exchange was solvent when the indebtedness was paid to the Hopewell bank, and remained so for some time thereafter.

We concur in the conclusion of the trial court that the directors suffered no loss under this contract. This conclusion makes it unnecessary to consider the defense of the statute of limitations.

The judgment is affirmed.